831 So.2d 697 (2002)
Samuel J. SAPORITO, JR., Appellant,
v.
Mary Y. SAPORITO, Appellee.
No. 5D02-200.
District Court of Appeal of Florida, Fifth District.
October 25, 2002.
*698 Terry L. Bledsoe of Terry L. Bledsoe, P.A., Casselberry, for Appellant.
Wendy L. Aikin of Wendy L. Aikin, P.A., Winter Park, for Appellee.
SAWAYA, J.
Samuel Saporito appeals the final judgment of dissolution of marriage dissolving his eighteen-month marriage to Mary Saporito. He argues (1) the trial court erred in failing to make findings to justify the entitlement, amount, and duration of the awards it made and (2) the trial court abused its discretion in awarding lump sum rehabilitative alimony, medical expenses and attorneys fees to Mary Saporito. Because our review of this case is thwarted by the failure of the final judgment to contain the requisite findings of fact, we must reverse and remand this case to the trial court for rendition of an amended final judgment containing specific findings of fact, supported by the evidence, to substantiate the awards made.
At seventy-seven years of age, Samuel is twenty-seven years older than Mary. Samuel testified that he was lonely after the death of his wife of forty-four years and was persuaded by a business acquaintance to contact that man's girlfriend's sister, Mary, who lived in Iraq. Samuel eventually capitulated and wrote Mary. Mary's sister paid for Samuel to fly to the Middle East to meet Mary. Samuel and Mary met and liked one another. After Samuel returned to Florida, Mary's brother told Samuel that Mary needed money, so Samuel sent her financial assistance. Samuel was encouraged to write love letters to Mary which would convince the INS that the two were in love and really wanted to marry. After Samuel obtained a fiancee visa for Mary, Mary flew to Chicago, explaining that she wanted to visit with her mother, two sisters, and brother who live there.
A cancerous lump was found in Mary's breast while she was in Chicago. Only then did Mary come to Florida. Samuel explained that it had been difficult for him to be the caretaker of his first wife, who had suffered from Alzheimer's disease, and he did not want to get into a situation where he would have to provide that care for Mary. It should be noted, too, that Samuel provides for the care and support of his adult son, who was brain-damaged at birth.
After Samuel refused to marry her, Mary went to live with her sister in Orlando and underwent the cancer operation. Several months after the operation, Mary called Samuel, crying and saying she did not want to return to Iraq. Samuel still refused to marry her, but did offer to pay an attorney if the attorney could find some way for Mary to stay in the country. The attorney was unsuccessful. Samuel decided then that because he had told her while *699 in the Middle East that he would marry her, he would stick to his promise and do so.
Samuel explained that he was lonely and the marriage would be convenient for both of them; Mary would get to live in the United States and he would have company. The two were married on August 12, 1999. Mary went to work at Burdines in October and switched to Dillards soon thereafter. Mary did as she pleased with the money she earned. It appears she was working in order to have health insurance because Samuel could not obtain any for her given her recent cancer surgery. Mary did not cook or clean for Samuel as Samuel had a housekeeper. Samuel provided a vehicle for Mary, but there was no commingling of assets.
Mary had not planned to leave her country, she testified, but she was lonely and, when she received the letters from Samuel, she thought he was lonely, too. Because she was over forty years old and had not had a relationship, she decided that she would just "give it a try." She stated that she is an educated person and made the decision to leave Iraq freely and "by my own." She thought she loved Samuel. Anticipating that her request to leave Iraq would be denied by the government because she was in charge of so many places in Iraq as branch manager for the machinery department of the Ministry of Housing, Mary left Iraq via Jordan.
Mary testified that she cannot support herself now, but would like to take a community college course and learn AutoCAD design engineering. The cost of this venture was presented to the court. Mary speaks four languages and admitted it was possible for her to get a job as an interpreter. She stated that the cancer had spread to a lung and her medicines are expensive. Although she had health insurance while employed at Dillards, she had recently quit that job to work for her sister's boyfriend. No insurance was provided at this new job, but the position allows her to rest as needed. She has continued her prior insurance via COBRA.
The trial court made numerous findings of fact, many of which are simply not supported by the evidence or are contrary to the evidence. Based on its findings, the trial court ordered Samuel to pay the lump sum of $70,192.44 as rehabilitative alimony (two months at $1,508.86 per month; twenty-four months at $2,382.28 per month; ten months at $1,000 per month). Samuel was made responsible for half of all non-covered medical expenses incurred by Mary during the marriage and since the date of separation. Samuel was also ordered to pay Mary's attorney's fees and costs.
This court is unable to sustain the rehabilitative alimony award given the failure of the final judgment to contain findings of fact relative to the factors set forth in section 61.08(2), Florida Statutes, to support the award. Just as Samuel argues, a trial court's failure to make the findings of fact required by section 61.08(2) constitutes reversible error. See Vitalis v. Vitalis, 799 So.2d 1127 (Fla. 5th DCA 2001); Hill v. Hooten, 776 So.2d 1004 (Fla. 5th DCA 2001); Brown v. Brown, 626 So.2d 1121 (Fla. 5th DCA 1993); Miller v. Miller, 625 So.2d 1320 (Fla. 5th DCA 1993); Moreno v. Moreno, 606 So.2d 1280 (Fla. 5th DCA 1992).
The trial court's order in this case focused on the circumstances surrounding Mary's departure from Iraq, Mary's medical condition, and Mary's financial situation relative to Samuel's, instead of addressing all of the factors necessary to fulfill the requirements of section 61.08(2). The trial court was clearly sympathetic to Mary's situation and concluded that Samuel *700 was in a position to assist her. While Samuel is obviously in good financial shape (assuming that the value of his investments has withstood the stock market's decline in the past year) relative to Mary, the fact remains that the parties were married only eighteen months, they kept their finances separate, Samuel provided housing and meals while Mary did not contribute to the household, Mary came to this country of her own free will, and Mary's medical condition pre-dated the marriage. These facts make an award of rehabilitative alimony highly questionable.
Moreover, the trial court's order recites facts which are not supported by the evidence. For example, the order recites that Mary
has little or no resources available to her, little or no job skills or education that can be utilized in the United States which can provide her with an income either commensurate to that which she possessed in Iraq or which would allow her to maintain a similar standard of living as that enjoyed during the marriage. The Wife is also of ill health with unpredictable but anticipated medical expenses of a sort that could be financially devastating to the Wife based upon her recurrence of cancer of her lung. The Wife has no one who can provide her financial assistance. Conversely, the Husband is very wealthy, in good health, lives in a $450,000 home and has unlimited resources, both personally and through family/friends. The Wife currently has a deficit of $1,508.86 per month to pay her living expenses. When enrolled in school and only working part-time, the Wife's monthly deficit will increase to $2,383.38 per month.
Why Mary's electrical engineering degree is worthless in the United States was never explained.[1] As far as having an income which will allow her to live as she did while married, the only record evidence of lifestyle was that Samuel retained a housekeeper and the parties drove old vehicles; otherwise, there was absolutely no testimony regarding level of lifestyle whatsoever. Furthermore, there was no evidence that Samuel was in good health or that he had any network of friends or family to help him, contrary to the court's findings. There was no evidence that he had any friends, and the only evidence of family is that he has a mentally handicapped adult son he must support and an adult daughter living in California. There was no evidence of the parties' standard of living[2] or Samuel's health, yet the trial court's order made findings on these topics.
Moreover, Mary's situation is not as bleak as the trial court apparently was persuaded. Mary testified that she has a bachelor of science degree (electrical engineering) from Bagdad University and had worked for twenty-one years for the government. She was self-supporting in Iraq, earning the equivalent of $75,000 annually before the Persian Gulf War, after which *701 the economy turned sour, and described herself as having been wealthy.
While this court is not to "substitute its judgment for that of the trial court through re-evaluation of the evidence," it is for this court to determine "whether the judgment of the trial court is supported by competent evidence." Deakyne v. Deakyne, 460 So.2d 582, 583 (Fla. 5th DCA 1984) (citing Kuvin v. Kuvin, 442 So.2d 203 (Fla.1983)). Herein lies the problem. In many instances, the evidence simply does not support the findings used to substantiate the grant of rehabilitative alimony. Furthermore, the final judgment does not reflect how the trial court arrived at the amounts of rehabilitative alimony it awarded or the duration of those awards. Remand is required for the trial court to make express findings, based on the evidence in the record, to support its conclusion that this is a proper case for an award of rehabilitative alimony in the first place. Assuming that it again imposes rehabilitative alimony, the trial court must make explicit the basis for the amount and duration of the award.
Next, Samuel challenges the portion of the trial court's order requiring him to pay half of the non-covered medical expenses incurred by Mary during the marriage and since the date of separation. Because the breast reconstruction was begun during the marriage and because Mary provided unrebutted testimony that Samuel promised to pay the expense of her breast reconstruction, some award is appropriate. The problem, however, is that the evidence of the amount of medical bills does not tally with the court's award and the order does not contain specific findings on this topic; rather it merely sets the amount. How the court arrived at the $6,874 amount is a mystery. Without specific findings, the award cannot be reviewed. Remand for appropriate supporting findings is required.
Finally, Samuel takes issue with the award of attorney's fees to Mary. The court found Mary had a "significant" need for fees and that Samuel had a "great" ability to pay and proceeded to order Samuel to pay $8,000 in fees. Reversal of the attorney's fee award is required because the trial court failed to make specific findings as to the number of hours reasonably expended and an hourly rate. See Simpson v. Simpson, 780 So.2d 985 (Fla. 5th DCA 2001) (reversing fee award because the trial court failed to make findings of fact in the judgment as to the number of hours spent and a reasonable hourly rate pursuant to Florida Patient's Compensation Fund v. Rowe, 472 So.2d 1145 (Fla.1985), modified, Standard Guaranty Insurance Co. v. Quanstrom, 555 So.2d 828 (Fla.1990)) (citing Ard v. Ard, 765 So.2d 106 (Fla. 1st DCA 2000); Shrove v. Shrove, 724 So.2d 679 (Fla. 4th DCA 1999); Hamlin v. Hamlin, 722 So.2d 851 (Fla. 1st DCA 1998); Warner v. Warner, 692 So.2d 266 (Fla. 5th DCA 1997); Rohlfs v. Rohlfs, 666 So.2d 568 (Fla. 3d DCA 1996); Sunday v. Sunday, 610 So.2d 62 (Fla. 3d DCA 1992); Maas v. Maas, 541 So.2d 160 (Fla. 2d DCA 1989)). On remand, the trial court must make the express findings necessary to support any fee award based on the evidence in the record.[3]
*702 In summary, we reverse the portion of the order awarding rehabilitative alimony and remand with directions to the trial court to enter an order containing specific findings, supported by the record evidence, to substantiate the award of rehabilitative alimony if such can be done. We also reverse and remand both the medical expense award and the attorney's fee award with directions to the trial court to make specific fact findings to support these awards.
AFFIRMED in part; REVERSED in part; REMANDED with instructions.
THOMPSON, C.J., concurs.
HARRIS, J., concurs specially, with opinion.
HARRIS, J., concurring specially:
I agree that a reversal is required in this cause. However, I suggest that the trial judge carefully consider whether an eighteen-month marriage of convenience which is not shown to have contributed to the need for rehabilitation should nevertheless support a "rehabilitation scholarship." Further, the court should carefully consider whether such a short-term marriage should obligate one spouse to pay the future medical expenses related to premarital medical conditions.
NOTES
[1] Whether the marriage affected Mary's employability is open to debate. There was no evidence that Mary could not become employed as a professional engineer, yet the circumstances suggest that she could not. Why would she seek a two-year degree in AutoCAD design if her four-year degree was of value?
[2] The closest that anyone came to establishing standard of living came when Mary was asked about her claim that since the separation, she continues to spend $625 per month on clothing, grooming, and entertainment for herself even though she makes only a little over $1000 per month. After Mary confirmed this amount, the attorney inquired, "So you had a standard of living that you were used to before?" Mary answered, "Yeah." This was the only inquiry into standard of living, and it obviously was meaningless.
[3] Samuel also argues that because Mary's attorney just handed an affidavit to the trial court at the hearing, but did not have the affidavit admitted into evidence, Mary failed to provide evidence of fees and thus outright reversal of the fee award is appropriate. Had there been no mention of fees at trial (Mary testified to having paid between $5,000 and $6,000 to her attorney) and had there been no indication that the court had received an affidavit of fees, then reversal would have been required. See Warner v. Warner, 692 So.2d 266 (Fla. 5th DCA 1997); Davis v. Davis, 613 So.2d 147 (Fla. 1st DCA 1993); Wiley v. Wiley, 485 So.2d 2 (Fla. 5th DCA 1986); see also Broyles v. Broyles, 573 So.2d 357 (Fla. 5th DCA 1990), review dismissed, 584 So.2d 997 (Fla.1991). However, the instant case is distinguishable from this line of cases because an affidavit was presented to the trial court to substantiate the award. The fact that the affidavit was not moved into evidence is not fatal given that Samuel did not object below to the court's consideration of the affidavit without the affidavit having been moved into evidence. See Fauls v. Sheriff of Leon County, 394 So.2d 117 (Fla.1981).